Abram CHASINS, Appellee,

v.

SMITH, BARNEY & CO., Inc., Appellant.

Nos. 551, 657, Dockets 34326, 34456.

United States Court of Appeals, Second Circuit.

Argued March 13, 1970.

Decided July 7, 1970.

Substituted Opinion and Rehearing In Banc Denied March 2, 1971.

Friendly, Circuit Judge, joined by Lumbard, Chief Judge, and Moore, Circuit Judge, filed opinion dissenting from the denial of rehearing in banc; Feinberg, Circuit Judge, did not participate.

**1168**

Marvin Schwartz, New York City (Sullivan & Cromwell, New York City, Michael M. Maney, New York City, of counsel), for appellant.

Edward M. Rosenfeld, New York City (Graubard, Moskowitz, McGoldrick, Dannett & Horowitz, New York City, Philip Kazon, Jack Weinberg, New York City, of counsel), for appellee.

Leonard M. Leiman, New York City (Reavis & McGrath, New York City, Richard O. Scribner, New York City, of counsel), on the brief for Ass'n of Stock Exchange Firms, amicus curiae.

Robert A. Bicks, Paul E. Arneson, New York City (Breed, Abbott & Morgan, New York City, Lloyd J. Derrickson, Vice President and Gen. Counsel, and Frank J. Wilson, Secretary and Associate Gen. Counsel, National Ass'n of Securities Dealers, Inc., Washington, D. C., on the brief for National Association of Securities Dealers, Inc. as amicus curiae.

Philip A. Loomis, Jr., Gen. Counsel, S. E. C., Washington, D. C., for Securities and Exchange Commission, as amicus curiae.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

On petition for rehearing, the opinion filed July 7, 1970 is withdrawn and the following opinion substituted therefor. The petition for rehearing is otherwise denied.

This is an appeal by Smith, Barney & Co., Inc., a stock brokerage firm [hereinafter "Smith, Barney"] from a judgment for damages on a determination by Judge Dudley B. Bonsal in the United States District Court for the Southern District of New York that Smith, Barney had violated Rules 10b–5 and 15c1–4 (17 C.F.R. §§ 240.10b–5 and 240.15c1–4),[1] promulgated under the Se-

---

1. (a) 17 C.F.R. § 240.10b–5 provides as follows:

 Rule 10b–5. Employment of Manipulative and Deceptive Devices.

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange

 (1) to employ any device, scheme, or artifice to defraud,

 (2) to make any untrue statement of a material fact or to omit to state a

curities Exchange Act, 15 U.S.C. §§ 78j (b) and 78o(c), in not disclosing to appellee (Chasins) that it was making a market in the securities it sold Chasins in the over-the-counter market. Chasins has cross-appealed the district court's ruling that appellant had not violated its common law fiduciary duty to Chasins by the manner it handled the transactions between the two.[2] We find no error and affirm the judgment.

This action brought by Chasins in the district court under the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., for damages resulting from Smith, Barney's alleged violations of the Acts, and pendent common law violations, in handling Chasins' securities brokerage account was tried to the court without a jury. At the time the four transactions in question in his appeal occurred,[3] Chasins was the musical director of radio station WQXR in New York City and was the commentator on a musical program sponsored by Smith, Barney. According to Chasins it was due to this relationship that he opened his brokerage account with Smith, Barney by orally retaining it to act as his stock broker. Smith, Barney acted in at least two capacities in these transactions, namely as Chasins' stockbroker and as principal, i. e., the owner of the security being sold to Chasins. In all four transactions Smith, Barney sold the securities to Chasins in the over-the-counter market, and although it revealed in the confirmation slips that it was acting as principal and for its own account in selling to Chasins, Smith, Barney did not reveal that it was "making a market" in the securities involved as was the fact. Nor did Smith, Barney dis-

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

(b) 17 C.F.R. § 240.15c1–4 provides as follows:

Rule 15c1–4. Confirmation of Transactions.

The term "manipulative, deceptive, or other fraudulent device or contrivance," as used in section 15(c) (1) of the Act, is hereby defined to include any act of any broker or dealer designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security * * * unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing (1) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person; * * *

2. Chasins has also appealed a discovery ruling made in an order prior to trial by Judge Harold R. Tyler, Jr. in the district court. In light of our decision finding Smith, Barney to have violated Rule 10b–5, we do not reach the question of whether this ruling constituted prejudicial error.

3. The four securities transactions involved in this appeal were sales of securities by Smith, Barney to Chasins in the over-the-counter market as follows:

| Date | Number of Shares | Company |
|---|---|---|
| 7/19/61 | 200 | Welch Scientific Company |
| 7/19/61 | 200 | Tex-Star Oil and Gas Corp. |
| 7/19/61 | 200 | Howard Johnson Company |
| 8/22/61 | 200 | Welch Scientific Company |

Total cost of the securities to Chasins was $34,950; he subsequently sold these securities on June 28, 1962 for $16,333.36.

There were other transactions involving the two parties that were questioned by Chasins in the district court; however, the decision regarding those transactions was not appealed except to the extent that Chasins appealed the decision that there was no breach of a common law fiduciary duty by Smith, Barney in handling Chasins' account.

close how much it had paid for the securities sold as principal to Chasins or that it had acted as an "underwriter" as defined by the Securities Act of 1933 in connection with the distribution of securities of Welch Scientific Company and Howard Johnson Company, two of the companies whose securities Smith, Barney sold to Chasins.

Preceding the four sales of July and August, 1961, Smith, Barney sent Chasins a written analysis of his then current. security holdings and its recommendations in regard to his objective of aggressive growth of his holdings. The recommendations included strong purchase recommendations for securities of Welch Scientific, Tex-Star Oil and Gas Corp., and Howard Johnson Company. Chasins and Thomas N. Delaney, Jr., an authorized agent of Smith, Barney had various telephone conversations prior to the transactions in question. Delaney testified that at least at the times of the four transactions in question Smith, Barney was "making a market" in those securities, i. e., it was maintaining a position in the stocks on its own account by participating in over-the-counter trading in them; Smith, Barney's records indicated that at least from June 30, 1961, it had been trading in those stocks and had held positions in them during the times Chasins purchased the securities from it.[4] There was no testimony that Chasins had any knowledge or notice that Smith, Barney was "making a market" in the securities of the three companies.

The decision of the district court was based on conflicting evidence as to whether Chasins had a "discretionary account" with Smith, Barney and on the four transactions above. Although the court ruled that Smith, Barney had not violated any common law fiduciary duty to Chasins, Smith, Barney was found to have violated Rules 10b–5 and 15c1–4 (the latter in a supplemental opinion) in not disclosing its market making (or dealer) status in the securities that it recommended Chasins purchase, when Chasins followed that advice and purchased the securities and Smith, Barney was the other principal in the sales. Damages were awarded to Chasins in the amount of $18,616.64, with interest, which constituted the difference between the price at which Chasins purchased the securities from Smith, Barney and the price at which he later sold them (prior to discovering Smith, Barney's market making in the securities).

I.

## VIOLATIONS OF RULES 10b–5 AND 15c1–4

Smith, Barney's major contention in attacking the district court's finding of a violation of Rules 10b–5 and 15c1–4 is that failure to disclose its "market making" role in the securities exchanged over the counter was not failure to disclose a material fact. Appel-

---

4. Market maker has been defined by SEC Rule 17a–9(f) (1), 17 C.F.R. § 240.17a–9 (f) as follows:
 (1) The term "market-maker" shall mean a dealer who, with respect to a particular security, holds himself out (by entering indications of interest in purchasing and selling in an inter-dealer quotations system or otherwise) as being willing to buy and sell for his own account on a continuous basis otherwise than on a national securities exchange.
 See also Loeser, The Over the Counter Securities Market What It is and How It Operates, pp. 5–6 (1940):

A dealer engages in "creating and maintaining a market" for securities. [It] "creates a market for a security when it is prepared both to buy and to sell that security at the prices it quotes, and it "maintains" such a market when it continues over a period to quote the prices at which it is ready both to buy and to sell. * * * In the language of finance the house is said to be "creating and maintaining a market" or, colloquially, "making a market." * * * Id. at 5–6. See also Id. at 39–41.

lant contends that the district court's holding went farther than any other decision in this area and that no court had ever found failure to disclose a "market making" role by a stock brokerage firm to a client-purchaser to be a violation of Rule 10b–5. Smith, Barney also asserts that all brokerage firms had followed the same practice and had never thought such disclosure was required; moreover, the SEC had never prosecuted any firm for this violation. However, even where a defendant is successful in showing that it has followed a customary course in the industry, the first litigation of such a practice is a proper occasion for its outlawry if it is in fact in violation. See Opper v. Hancock Securities Corp., 250 F.Supp. 668, 676 (S.D.N.Y.1966), aff'd 367 F.2d 157 (2d Cir. 1966). In any event, it cannot fairly be said that no one in the trade had ever considered such nondisclosure to be significant.[5] Appellant's own customers man (Delaney) testified that at the time (1961) he was disclosing to retail clients the firm's role as a market maker in a given security whenever he was aware of it.

Appellant also points to the fact that in over-the-counter trading, a market maker with an inventory in a stock is considered the best source of the security (the best available market); thus, the SEC has even punished a brokerage firm for not going directly to a firm with an inventory in a stock, i. e., interposing another firm between them. See e. g. In re Thomson & McKinnon, CCH Fed.Sec.L.Rep. ¶ 77,572, p. 83, 203 (1967–69 SEC Rulings). However, the fact that dealing with a market maker should be considered by some desirable for some purposes does not mean that the failure to disclose Smith, Barney's market-making role is not under the circumstances of this case a failure to disclose a material fact. The question here is not whether Smith, Barney sold to Chasins at a fair price but whether disclosure of Smith, Barney's being a market maker in the Welch Scientific, Tex-Star Oil and Gas and Howard Johnson securities might have influenced Chasins' decision to buy the stock. See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). The test of materiality " * * * is whether a reasonable man would attach importance * * * in determining his choice of action in the transaction in question. * * * " List v. Fashion Park, Inc., *supra,* at 340 F.2d 462; SEC v. Texas Gulf Sulphur Co., *supra,* at 401 F.2d 849; i. e., a material fact is one " * * * which in reasonable and objective contemplation might affect the value of the corporation's stock or securities. * * * " Kohler v. Kohler Co., 319 F.2d 634, 642 (7 Cir. 1963); List v. Fashion Park, Inc., *supra,* at 340 F.2d 462; SEC v. Texas Gulf Sulphur Co., *supra,* at 401 F.2d 849. See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In applying that test in this case, the question of materiality becomes whether a reasonable man in Chasins' position might well have acted otherwise than to purchase if he had been informed of Smith, Barney's market making role in the three stocks in addition to the fact that Smith, Barney was the other principal in the transaction. The broker-dealer, Smith, Barney, had undertaken to make a written evalua-

---

5. Indeed, soon after the Special Study of Securities Markets, H.R.Doc. No. 95, 88th Cong., 1st Sess., pt. 1 at 385, 386 (1963) recommended required disclosures in written advice of existing positions and market-making activities, the National Association of Securities Dealers adopted such a rule for its members in their advertisements, sales literature, and market letters. See CCH NASD Manual ¶ 2151, at 2016–17 (Sept. 1964). Cf. 2 CCH New York Stock Exchange Guide ¶ 2474A. 10.

tion of Chasins' securities holdings and had strongly recommended sales of some of his holdings and purchases of these three stocks in which Smith, Barney was dealing as a principal.

Knowledge of the additional fact of market making by Smith, Barney in the three securities recommended could well influence the decision of a client in Chasins' position, depending on the broker-dealer's undertaking to analyze and advise, whether to follow its recommendation to buy the securities; disclosure of the fact would indicate the possibility of adverse interests which might be reflected in Smith, Barney's recommendations. Smith, Barney could well be caught in either a "short" position or a "long" position in a security, because of erroneous judgment of supply and demand at given levels. If over supplied, it may be to the interest of a market maker to attempt to unload the securities on his retail clients. Here, Smith, Barney's strong recommendations of the three securities Chasins purchased could have been motivated by its own market position rather than the intrinsic desirability of the securities for Chasins. An investor who is at least informed of the possibility of such adverse interests, due to his broker's market making in the securities recommended, can question the reasons for the recommendations. The investor, such as Chasins, must be permitted to evaluate overlapping motivations through appropriate disclosures, especially where one motivation is economic self-interest. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 at 196, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

In the case at bar, the broker-dealer had undertaken at its customer's request to make a written evaluation of his securities holdings and recommendations for further purchases and sales knowing that the customer, who was, as pointed out above, musical director of a radio station and commentator on a musical program sponsored by Smith, Barney, would rely on its report to him. In this situation failure to inform the customer fully of its possible conflict of interest, in that it was a market maker in the securities which it strongly recommended for purchase by him, was an omission of material fact in violation of Rule 10b–5, 17 C.F.R. 240.10b–5.

The Securities and Exchange Commission is presently engaged in consideration of the advisability of rules on disclosure of the fact of market making, to delineate the extent and time of disclosure to be required, and whether distinction should be made as, for instance, between situations where the particular broker-dealer is the sole or dominant market maker and situations where it is one of a number of market makers and the price is competitive with quotes of other market makers. Such rules and similar rules of the self-regulatory agencies may well promote full and fair disclosure, while, in the words of the SEC "furthering customer protection." We do not attempt to address ourselves to the question of the best mechanics for disclosure. We here go so far only as to hold that under the particular circumstances proved in this case the court was correct in holding that the failure to disclose was the omission of a material fact.

■ To the extent that reliance is necessary for a finding of a 10b–5 violation in a non-disclosure case such as this, the test is properly one of tort "causation in fact." Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969). Chasins relied upon Smith, Barney's recommendations of purchase made without the disclosure of a material fact, purchased the securities recommended, and suffered a loss in their resale. Causation in fact or adequate reliance was sufficiently shown by Chasins.

In view of our agreement with the finding of violation of Rule 10b–5 we need not determine whether this failure to disclose market-making or dealer status also violated Rule 15c1–4 as found

by Judge Bonsal in his supplemental memorandum of decision.[6, 7, 8]

 Smith, Barney's final challenge [9] is to the amount of damages awarded to Chasins, claiming that only the difference between the price charged him on his purchases and the fair market value on the purchase dates could be granted; we disagree. Since Smith, Barney violated Rule 10b–5 with respect to these securities, Chasins is entitled to recover his damages resulting from such violation. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Although Smith, Barney submitted an affidavit on the issue of damages, indicating that the price Chasins paid for his purchases was the same as that generally available from other dealers for the same securities, that is not the question here. The issue is not whether Smith, Barney was actually manipulating the price on Chasins or whether he paid a fair price, but rather the possible effect of disclosure of Smith, Barney's market-making role on Chasins' decision to purchase at all on Smith, Barney's recommendation. It is the latter inducement to purchase by Smith, Barney without disclosure of its interest that is the basis of this violation; the evil in such a case is that recommendations to clients will be based upon the best interests of the dealer rather than the client. The amount of damages granted in this case, $18,616.64, was the difference between the purchase price to Chasins ($34,950.00) and the amount Chasins received when he subsequently sold the securities ($16,333.36) prior to his awareness of a violation of the Securities Exchange Act and the rules promulgated thereunder. Such a measurement is justified where, as here, the evil is not the price at which Chasins bought but the fact of being induced to buy and invest for some future growth in these stocks without disclosure of Smith, Barney's interest; the damages granted were proper under the circumstances. Cf. Sarlie v. E. L. Bruce Co., 265 F.Supp. 371 (S.D.N.Y.1967).

## II.

### CHASINS' CROSS-APPEAL

In his cross-appeal Chasins contends that the district court erred in finding no violation of a common law fiduciary

6. That rule requires, *inter alia*, that a broker or dealer disclose when he is acting as a dealer for his own account. The confirmation slips simply notified Chasins that Smith, Barney had acted as the other principal in the particular transaction; this did not indicate whether it had acted as a dealer for its own account.

7. See fn. 1(b), *supra*.

8. The definition of a dealer is given in 15 U.S.C. § 78c(a) (5) as follows:
 (5) The term "dealer" means any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include * * * any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business.
 Since Smith, Barney was making a market in the securities involved, it was part of its regular business to buy and sell the securities for its own account.

9. Smith, Barney also challenges the decision on the ground that the issue of fail-ure to disclose its market-making role being a violation of Rule 10b–5 was not presented until Judge Bonsal rendered his decision. Although the complaint did not specifically allege this as one of the violations of 10b–5, Chasins complained in general about nondisclosures and asserted that these nondisclosures violated the rule since they were nondisclosures of material facts. The pre-trial order was also broadly formulated, and the court, in discussion with trial counsel, indicated that he considered the fact of market making relevant to the issues presented in this case. This was sufficient to put Smith, Barney on notice that nondisclosure of its market-making role in these securities was an issue when Delaney, its representative, testified that at the time of the transactions in question he normally disclosed to clients the fact that Smith, Barney was making a market in securities he recommended. Under such circumstances, this issue was involved in the case, and the district court could properly dispose of it. See Rule 15(b), Federal Rules of Civil Procedure. Cf. Bucky v. Sebo, 208 F.2d 304 (2d Cir. 1953).

duty to Chasins by Smith, Barney in the way Chasins' account was handled. The cross-appeal is not pressed, however, unless the judgment in plaintiff's favor is reversed in whole or in part. We therefore do not reach it here.

Affirmed.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge.

A petition for rehearing containing a suggestion that the action be reheard *in banc* having been filed herein by counsel for the appellant, and the panel having determined to withdraw its opinion, filed July 7, 1970, and to file a new opinion in substitution.

It is ordered that said petition be and it hereby is denied, LUMBARD, Chief Judge, MOORE and FRIENDLY, Circuit Judges, dissenting from such denial in an opinion by Judge FRIENDLY which follows, and FEINBERG, Circuit Judge, taking no part in the consideration or decision of this petition.

FRIENDLY, Circuit Judge, with whom LUMBARD, Chief Judge, and MOORE, Circuit Judge, join (dissenting from the denial of reconsideration *in banc*):

Although the narrowing of the opinion to the particular constellation of facts here presented substantially lessens its impact, we are nevertheless constrained to voice our dissent from the refusal to grant *in banc* reconsideration.

The transactions here in question were in securities traded on the "over-the-counter" market. Section 15(c) (1) of the Securities Exchange Act, which deals with this subject, provides:

No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent.

Responsive to this Congressional direction, the SEC adopted Rule 15c1–4, which provides in pertinent part:

The term "manipulative, deceptive, or other fraudulent device or contrivance," as used in section 15(c) (1) of the Act, is hereby defined to include any act of any broker or dealer designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security (other than United States Tax Savings Notes, United States Defense Savings Stamps, or United States Defense Savings Bonds, Series E, F and G) unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing (1) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person; * * *

The district court initially found that the confirmations here, which disclosed that Smith Barney was selling "as principal for our own account," were in full compliance with the rule. Although Rule 17a–9(f) defines "market-maker," this is in a reporting requirement; it is conceded that in 1961 no rule of the SEC (other than, allegedly, the inevitable Rule 10b–5), the NASD or the New York Stock Exchange required disclosure of that fact to a customer.

The complaint nowhere asserted that Smith Barney was under a duty to tell Mr. Chasins it was a "market-maker" in the three over-the-counter stocks that he bought. It alleged rather that defendant did not disclose the "best price" at which these and other securities could

have been bought or sold in the open market, or the prices it had paid or received, and that plaintiff was deceived by Smith Barney's failure to disclose "the material fact of its adverse interest, the extent of which is today still unknown to and not determinable by plaintiff." The plaintiff, a noted musicologist, said nothing about market-making in his testimony. The closest he came to making the claim now sustained was that, despite his alleged inability to comprehend financial matters, he would have understood if told that the stock reflected by the confirmations was owned by the defendant, since "if you have a great picture, for example, and you know that the picture is going to be worth a lot more the next year or five years or ten, I don't think you would be anxious to dispose of it." Although this is hardly convincing, since great pictures are constantly being sold and bought under exactly such circumstances, Mr. Chasins had been plainly told of defendant's ownership by the confirmation slips. In addition, the Smith Barney research report he had received on Tex-Star contained the legend in common use at the time:

> We point out that in the course of our regular business we may be long or short of any of the above securities at any time,

and the prospectus he received of Welch Scientific Company disclosed that Smith Barney was one of the underwriters of that stock, which had only recently been placed on the market.[1] All that the trial record contained about non-disclosure of market making was a statement by Delaney, a registered representative of Smith Barney, that he normally would bring this fact to the attention of clients if he knew it; that he did know Smith Barney was making a market in the three stocks; and that he couldn't recall whether or not he had brought this to Mr. Chasins' attention.

The issue of market making first assumed importance as a result of the opinion of the district judge. After finding against the plaintiff on all the contentions that had been advanced in the complaint and aired at the trial, he opined that information with respect to market-making "was material to the plaintiff in considering the price at which he purchased the securities, and to what extent the price was based on defendant's own market activities," and therefore plaintiff should recover his entire market loss. Smith Barney then made a motion pointing out there was no basis for the "therefore," since on the judge's theory the only recoverable damage would be any excessive price obtained as a result of Smith Barney's being a market maker. On that issue it submitted proof by way of affidavit that the prices charged the plaintiff for the three stocks were entirely fair, indeed less than he would have paid if he had bought the stocks from a person acting solely as broker. It also submitted the opinion of the experienced manager of its trading department that

> From the point of view of the knowledgeable investor, disclosure to him that he would be purchasing from a market maker would only have encouraged him in his decision to buy.

Unwilling to hear evidence on the issue first raised by its opinion, the district court took a new tack. It held, in seeming contradiction of the initial opinion, that the confirmations, in a form widely used, did not comply with Rule 15c–1–4 since they conveyed "the impression that defendant had purchased a block of the securities and was selling part of it to plaintiff at the then prevailing market prices, when, in fact, defendant was acting as a dealer for its own account." We are unable to follow this, especially in light of the definition of "dealer" in § 3 (a) (5), and the court wisely does not base its decision upon it. Evidently lacking confidence in that holding, the judge then went on to conclude, without semblance of an evidentiary basis, that

---

1. The Howard Johnson prospectus also revealed this, but the record is not clear whether plaintiff received this.

disclosure of market-making might have led Mr. Chasins not to purchase the stocks at all.

The conclusions on the materiality of disclosure of market making by the district court and in this court's opinion are predicated on an essential misconception of the role of the market maker in over-the-counter transactions. When a reputable house like Smith Barney acts as one of several market makers, as was the case here, it serves a highly desirable purpose in reducing the spreads characteristic of over-the-counter trading. It has been widely recognized that the "best price" can be obtained by dealing directly with market makers, for one reason because a commission to an intermediary is avoided. See Thomson & McKinnon, CCH Fed.Sec.L.Rep. ¶ 77,572 (1968); Delaware Management Co., CCH Fed.Sec. L.Rep. ¶ 77,458 (1967); H. C. Keister & Co., CCH Fed.Sec.L.Rep. ¶ 77,414 (1966); Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R.Rep.No.2337, 89th Cong.2d Sess., at 179 (1966). The district judge's fears concerning the ability of a market maker to set an arbitrary price are inapplicable when as here there were several market makers, as Smith Barney pointed out in its post-trial motion and the SEC now confirms in its letter to us as *amicus curiae*. Moreover Smith Barney offered to prove that in fact Mr. Chasins bought at the lowest available price. So far as concerns the fears of ulterior motives voiced by the

district judge and now by the court, the market maker, who buys as well as sells, is *less* likely to be interested in palming off a stock than a dealer with only a long position. Yet the confirmation here would plainly have been adequate for such a dealer, and we held only recently, in a case curiously not cited, that a dealer need not make the additional disclosure that it had originally acquired the stock for investment and not with a view towards distribution, something considerably more material than being one of several market makers, S. E. C. v. R. A. Holman & Co., 366 F.2d 456, 457 (2 Cir., 1966). At the very least the materiality of market making to an investment decision was an issue on which Smith Barney was entitled to submit proofs. It never had had a fair opportunity to do this, although we read the court's opinion as leaving this open to defendants in future cases.

The references in footnote 5 to the SEC's Special Study of the Securities Markets, 85th Cong. 1st Sess., House Document No. 95, published nearly two years after plaintiff's purchases, and the rules later adopted by the NASD and NYSE, slip opinions 3717 fn. 5, point in the opposite direction from the conclusions drawn from them. The Study developed the existence of problems calling for *administrative* action with *prospective* application, not for a retroactive sanction.[2] The NASD and NYSE rules, also adopted long after the transactions here at issue, require disclosure of mar-

---

**2.** The Study discusses the problem in two different contexts. In dealing with the quality of investment advice furnished by broker-dealers, it concludes that this area "lends itself to establishment of standards through statements of policy, covering such matters as * * * (b) required disclosures in written advice of existing positions, intended positions and market-making activities, rather than general 'hedge' clauses as to possible present conflicting positions or transactions * * *" Part I, p. 386. This goes far beyond market making; whatever its desirability for the future, the Study made no suggestion that such standards should apply to the past, and

we held in the *Holman* case, cited in the text, that failure to disclose an existing position, even one taken for investment and not for distribution, did not violate Rule 10b-5. The more specific discussion of market-making related to pricing, and suggested, Part II, p. 677, that the NASD and the Commission should "reexamine present requirements with a view to improving disclosures" including a broker-dealer's soliciting a customer's purchase of a security out of its own inventory. Nothing suggests that the group of experts who made the Special Study had any notion that these recommended changes were already covered by Rule 10b-5.

ket making only in printed research reports and other published recommendations which could affect market prices for securities, not in individual advice to customers. As appears from the SEC's *amicus* letter, the agency has the whole problem under active consideration and expects to promulgate a rule for prospective application. Although the opinion is now limited to the peculiar facts of this case, we fear it will encourage many suits by other speculators who have suffered losses. At minimum, Smith Barney is entitled to a new trial where the issues of materiality and reliance raised by the district court's opinion can be fairly litigated.