## In re LETTERMAN BROTHERS ENERGY SECURITIES LITIGATION.

**Donald A. DRAKE, et al., Plaintiffs,**

v.

**LETTERMAN TRANSACTION SERVICES, et al., Defendants.**

**LETTERMAN BROTHERS ENERGY PROGRAM, et al., Plaintiffs-Appellants,**

v.

**BANCTEXAS DALLAS, N.A., et al., Defendants-Appellees.**

**Richard J. STUART, et al., Plaintiffs,**

v.

**LETTERMAN BROTHERS ENERGY, et al., Defendants-Third Party, Plaintiffs-Appellants,**

v.

**BANCTEXAS DALLAS, N.A., et al., Third Party Defendants-Appellees.**

No. 85-1446.

United States Court of Appeals, Fifth Circuit.

Sept. 12, 1986.

Rehearing and Rehearing En Banc Denied Oct. 9, 1986.

William A. Wineberg, Broad, Schulz, Larson & Wineberg, Michael R. Simmonds, San Francisco, Cal., Cullum & DeYoung, Edwin R. DeYoung, Dallas, Tex., for Letterman, etc.

W. Ted Minick, Winstead, McGuire, Sechrest & Minick, David C. Mattka, Ivan M. Scott, Jr., Dallas, Tex., for BancTexas Dallas, N.A. (Formerly NBC).

Before GOLDBERG, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants Letterman Brothers Energy Programs ("Energy Programs"), Letterman Brothers (a California partnership), Bryce L. Letterman, Scott M. Letterman, and Letterman Transaction Services, Inc. (a California corporation) suffered substantial financial losses as a result of investments in oil and gas leases that they entered into with Wells-Battelstein Oil & Gas, Inc. Appellants thereafter brought claims against appellee BancTexas and against Walter D. Wells, Jr. and Barry L. Battelstein, the principal stockholders of Wells-Battelstein, a Texas corporation that operated the leases purchased by appellants. The suit was brought under the federal securities laws and under Texas law. Proceedings against Wells and Battelstein, however, were subsequently stayed after these two defendants petitioned for relief in bankruptcy court.

The district court directed a verdict in favor of BancTexas on the federal securities claim. The remaining issues of negligent misrepresentation and breach of fiduciary duty were then presented to the jury which found in favor of appellants. Upon BancTexas' motion, however, the district court then ordered judgment for BancTexas notwithstanding these verdicts. Appellants now urge us to reverse these rulings.

I.

The Energy Programs comprise eleven California limited partnerships. Letterman Brothers, a general partnership consisting of Bryce L. Letterman and Scott M. Letterman, is the general partner of each of these limited partnerships. The Lettermans attracted various private investors to participate in the Energy Programs as limited partners. The Lettermans began participating in oil and gas ventures in 1978. They had formed and operated several limited partnerships of this kind before they entered into the transactions at issue in this case.

In the spring of 1980, Bryce Letterman was approached by Wells-Battelstein about investing in certain oil and gas leases locat-

ed in Kansas and operated by Wells-Battelstein. At that time, Wells-Battelstein was a new entity created through the merger of two companies previously involved in oil and gas ventures. Wells-Battelstein had approached BancTexas about a loan on or about October, 1979. At the time it approached BancTexas, Wells-Battelstein had a net worth of about $2,500,000. BancTexas agreed to established a $1,000,000 line of credit for Wells-Battelstein and advanced $400,000 to it based upon an appraisal of leases it held. Wells-Battelstein's credit line was increased by BancTexas to $2,500,000 on or about June, 1980.

After this initial contact, Bryce Letterman apparently became interested in investing in these leases. Soon thereafter he met with Barry Battelstein in Houston. Letterman also visited various Wells-Battelstein facilities over the next day and a half following his meeting with Battelstein. Letterman talked to various Wells-Battelstein suppliers, a geologist, and a banker at Interfirst Houston. Letterman also received a financial statement and a drilling history of Wells-Battelstein.

Letterman then contacted the head of the energy department at a bank in Ohio that had financed previous Letterman projects. This bank, however, informed Letterman that Kansas was outside of the geographical area in which it did business. At that point, Wells-Battelstein referred Letterman to BancTexas and specifically to Terry Stuart, Wells-Battelstein's loan officer there. Bryce Letterman talked to Stuart regarding financing for these ventures and regarding Wells-Battelstein's reputation with BancTexas.

Letterman testified at trial that Stuart had told him that Wells-Battelstein was one of the bank's most successful customers, that it was a creditworthy company of very high integrity, and that the bank thought a great deal of Wells-Battelstein as a customer. Eventually, it was agreed that BancTexas would provide loans to eight of the

eleven Energy Programs that would enter into oil and gas ventures with Wells-Battelstein. The other three Energy Programs borrowed the money they needed from Interfirst Bank Houston.

Each of the oil and gas agreements between Energy Programs and Wells-Battelstein provided for payments to be made by Energy Programs to Wells-Battelstein for the acquisition of certain oil and gas leases, the turnkey price for drilling wells at the sites specified in the leases, and various other estimated costs incurred in starting production on these lease sites. Operating expenses were to be billed to the Energy Programs separately as they were incurred.

These ventures proved to be far less successful than the participants had hoped because oil and gas production turned out to be lower than had been anticipated. As a result, Energy Programs received revenue well below that needed to pay their debts. Consequently, the Energy Programs suffered large financial losses. Some limited partner investors sued various Letterman entities in two separate actions to recover their investments. One of these suits was brought by a group of investors in the United States District Court for the Northern District of Texas against certain Letterman entities not appellants in this case. The other suit was filed in California federal court against four of the Energy Programs and other Letterman entities.

In January, 1983, appellants together brought suit against BancTexas complaining of violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, as well as claims of negligent misrepresentation and breach of fiduciary duty under Texas law.[1] This action was consolidated with the investors' suit filed in the Northern District of Texas previously. In the meanwhile, the Energy Programs sued in California had brought a third-party action against BancTexas seek-

---

1. Letterman Brothers had also brought claims for breach of the covenant of good faith and fair dealing and for violation of the California Corporations Code. These claims, however, were dismissed on March 19, 1984, pursuant to a BancTexas motion for summary judgment.

ing contribution and indemnity. This third-party action was subsequently severed from the California suit, transferred to the Northern District of Texas, and consolidated with the present action.

On March 19, 1984, the consolidated actions were brought to trial before a jury. At the close of appellants' evidence, the bank moved for a directed verdict. After all the parties had rested, the district court granted the bank's motion for a directed verdict with respect to the federal securities claims only, finding that the appellants had not met their burden of proof in establishing the value of the oil and gas leases as of the date appellants entered into their contracts.

Appellants' remaining claims, including those of the investors directed against the Letterman entities, were then submitted to the jury. The jury found against the investors, deciding that the Letterman entities had committed no fraud nor negligent misrepresentation in inducing participation in the Energy Programs. The jury, however, returned verdicts in favor of appellants against the bank on both the negligent misrepresentation and breach of fiduciary duty claims. The jury awarded appellants damages in the amount of $10,980,149.50.

Under Fed.R.Civ.P. 50, the bank then moved for judgment notwithstanding the verdict. The district court granted the bank's motion, finding on the negligent misrepresentation claim that the appellants had failed, as they had on the securities claim, to establish damages. On the fiduciary duty claim the court granted the motion j.n.o.v. because bank owed the appellants no fiduciary duty. The district court also conditionally ruled upon the bank's motion for a new trial pursuant to Rule 50(c)(1), finding that no grounds for granting a new trial existed.

On August 20, 1984, the district court entered judgment in favor of the bank on all claims and also on the third-party action transferred from California. On August 30, 1984, appellants moved for reconsideration of entry of judgment notwithstanding

the verdict and for a new trial. Appellants also moved to alter or amend the judgment. On June 20, 1985, the district court denied appellants' motions and entered an amended final judgment in favor of the bank and also entered judgment in favor of the Letterman entities against the investors. Appellants filed timely notice of appeal.[2]

In summary, appellants now urge us to reverse the decision of the district court in favor of BancTexas directing the verdict on the federal law claims and awarding judgment notwithstanding the verdict on the state law claims. Additionally, they ask us to reverse the district court's order denying their motion to amend the judgment with regard to their third-party action against the bank for contribution and indemnity.

## II.

We review the directed verdict and the judgment notwithstanding the verdict under the standard set out in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelming in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has

2. No appeal was taken by the investors in their action against the Letterman entities.

the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict.

*Id.* at 374.

This standard of review on appeal is the same as that used by a trial judge. *Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 94 (5th Cir.1985). It is a stringent standard and reflects the general policy that trial judges should rarely take issues away from juries or upset their verdicts. Nonetheless, a judge's decision to grant a directed verdict or a judgment notwithstanding the verdict is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury. *Lubbock Feedlots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 269 n. 22 (5th Cir.1980); *see also Harwood & Associates, Inc. v. Texas Bank & Trust,* 654 F.2d 1073, 1076 (5th Cir.1981).

### A. *Federal Securities Claim*

The district court directed a verdict in favor of BancTexas on appellants' federal securities claim because it found appellants had failed to establish damages under the proper measure of damages. Appellants now urge us to reverse this judgment on two grounds. First, they insist that the district court used an improper standard by which to evaluate damages, and second, they argue that sufficient evidence existed to establish the damages under either the standard the court used or the standard they urge.

The district court used the out-of-pocket measure of damages set out in *Huddleston v. Herman & MacLean,* 640 F.2d 534, 555 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Under *Huddleston,* in a Rule 10b–5 action a purchaser of securities may recover against a defendant with whom the purchaser was not in privity or who owed the purchaser no fiduciary duty only the "dif-

ference between the price paid and the 'real' value of the security ... at the time of the initial purchase by the defrauded buyer." *Id.* at 556.

Appellants argue first that the district court should have adopted a recissional measure of damages under the rule of *Chasins v. Smith, Barney & Co., Inc.,* 438 F.2d 1167, 1173 (2d Cir.1970). Appellants contend that the instant case is distinguishable from *Huddleston* and is analogous to *Chasins* in that it does not involve a misrepresentation of price, but rather an inducement to purchase. We find appellants' argument on this point unpersuasive. This case is squarely within the rule of *Huddleston.* *Huddleston* indeed explicitly reserves the *Chasins* recissional measure of damages for cases in which the purchaser and defendant are in privity or in which the defendant owes some fiduciary duty to the purchaser. *Id.* at 554. In *Chasins,* the plaintiff had been lured into purchasing securities on the basis of misrepresentations made by a broker. A broker is within the category of those who owe a special fiduciary duty to one who purchases securities from the broker or upon the broker's advice. *See Huddleston,* 640 F.2d at 554; *see also Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357, 1360 (8th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978).

A bank, unless it is acting as a broker or in a situation closely analogous to that of a broker, is not within the category of parties against whom recissional damages may be awarded. BancTexas' position in this case is analogous to that of the accountant-defendant in *Huddleston* who was held responsible only under the out-of-pocket standard. BancTexas did not act either directly or as agent in the selling of the interests to the Energy Program. Nor was BancTexas in the position of a fiduciary with regard to any of the appellants.[3] To hold BancTexas liable under a recissional standard "would be to place on [it] the burden of any decline in the value

---

**3.** See Part II–C of this opinion, *infra.*

of securities between the date of purchase and the date of sale even though only a portion of that decline may have been proximately caused by the defendant's wrong." *Huddleston*, 640 F.2d at 555.

██ Appellants argue next that even under the *Huddleston* standard, they have met their burden of proving damages. Specifically, they contend that the value of their interests at the time of purchase was zero, and thus that there are entitled to recover from the bank all payments made in connection with the oil and gas leases less whatever income may have been produced. Appellants' argument is without merit on this claim as well.

Despite their assertion that they received only a "bundle of rights" in purchasing these leases, appellants in fact acquired tangible assets. Leases that permit the exploration and exploitation of mineral resources are of considerable value. *See Phillips Petroleum Co. v. Cowden*, 241 F.2d 586, 590 (5th Cir.1957); *Wilson v. Texas Co.*, 237 S.W.2d 649, 650 (Tex.Civ. App.1951). The leases purchased by appellants here are assets of this kind.[4] Appellants make no allegations that BancTexas made any misrepresentation as to the value of the leases, but only as to the competency of Wells-Battelstein to operate them. The equipment purchased by appellants was also tangible property of some value.

Appellants' argument that these interests were, nevertheless, valueless because of the incompetence and inexperience of Wells-Battelstein is unpersuasive. Appellants, who were experienced in these types of ventures, had the option under the operating agreements to remove Wells-Battelstein as operator. Appellants reliance on *Woods v. Barnett Bank of Fort Lauder-*

*dale*, 765 F.2d 1004 (11th Cir.1985), is misplaced. In *Woods*, the Court held that bonds upon which the issuer had defaulted had a value of zero notwithstanding the fact that "only a portion of the proceeds released were diverted to an improper end." *Id.* at 1013. Appellants in this case, however, hold tangible assets consisting of oil and gas leases and drilling equipment. These types of assets are readily distinguishable from bonds in that they have an intrinsic value that may be realized upon resale. Bonds, on the other hand, have no inherent value aside from the issuer's financial soundness and commitment. We hold, therefore, that the district court correctly ruled that appellants had not established any damages under the out-of-pocket standard of *Huddleston*.

██ Appellants fall back upon the contention that the damages the jury awarded were proper consequential damages.[5] A plaintiff in a Rule 10b–5 action may properly recover consequential damages from a defendant where the plaintiff was induced to invest on the basis of a material misrepresentation or an omission. *James v. Meinke*, 778 F.2d 200, 206 (5th Cir.1985). The district court in the case before us described the nature and scope of appropriate consequential damages: "[T]he cost of: selling the leases, drilling to deeper layers to increase production or storing oil awaiting a price increase, all in the hope of recouping losses. In essense ... [consequential damages] would have been the additional expenses incurred by the energy programs as a result of BancTexas' negligence misrepresentations." We cannot accept appellants' argument that all their payments made in connection with the leases qualify as consequential damages. As

4. We here deny appellants' motion, carried with the case, to take judicial notioe of the bankruptcy court's files in *David V. Frederking, Trustee for Wells-Battelstein Oil & Gas, Inc. v. Letterman Brothers Energy Program 1980–2, et al.*, Adversary No. 84–0384–H3. Appellants argue that these files show the present value of their investments to be worthless. Inasmuch as the measure of damages under the out-of-pocket rule is computed at the time of the transaction, how-

ever, the bankruptcy court's file has no relevance.

5. Consequential damages might well have been the preferred remedy for appellants to have sought from the outset of this litigation since any misrepresentation BancTexas might have made went not to the value of the leases and equipment acquired but to the decision to choose Wells-Battelstein as the operator.

set out above, there was no evidence introduced into the record indicating that the leases appellants received were worth less than what appellants paid.

Appellants could have sought consequential damages for additional expenses that resulted from BancTexas' misrepresentations that led to the hiring of Wells-Battelstein as the lease operator. Of the $7,759,-941 in payments to Wells-Battelstein outlined in appellants' Exhibit H, it is possible that some may have justified a claim of consequential damages. If appellants had broken down the figures in their key exhibit to show how much of the claimed damages could properly have been awarded as consequential damages, some portion of their award might have survived BancTexas' motions. By not doing so, appellants cannot now be heard to argue this issue. *See James,* 778 F.2d at 207. We therefore affirm the district court's ruling.

■ Finally, appellants ask that we remand the case for a new trial with regard only to damages if we affirm the district court's ruling. We cannot do so. Appellants are not entitled to relitigate the issue of damages. The authorities appellants cite to support their position are not on point. *Sorrels v. Texas Bank & Trust Co. of Jacksonville Texas,* 597 F.2d 997 (5th Cir.1979), in which the issue of damages was remanded for a new trial, was decided upon review of a motion for a new trial, not upon review of a motion for directed verdict or for judgment notwithstanding the verdict that we must undertake here.

*Davis v. Safeway Stores, Inc.,* 532 F.2d 489 (5th Cir.1976), was remanded because the evidence in that case was insufficient to support the full amount of damages awarded. Unlike the instant case, however, there was enough evidence of damages in *Davis* to support some award, albeit a lower one. Finally, in *Gleason v. Title Guarantee Co.,* 300 F.2d 813 (5th Cir.1962), the issue of

damages was remanded because damages had been awarded under an incorrect legal standard, not because of the nonexistence of evidence to support the award. Appellants had adequate opportunity to present sufficient evidence as to damages in this case. They did not do so and thus are bound by the decision.

### B. *Negligent Misrepresentation Claim*

The district court granted BancTexas judgment on appellants' claims of negligent misrepresentation under Texas law [6] notwithstanding the jury's verdict for appellants. The district court did so for the same reason that it directed a verdict for BancTexas on the securities claim: appellants' failure to prove out-of-pocket damages.

■ Texas law permits an action for negligent misrepresentation, as a form of remedial fraud, as defined in the Restatement (Second) of Torts, § 552. *Great American Mortgage Investors v. Louisville Title Insurance Co.,* 597 S.W.2d 425, 429 (Tex.Civ.App.1980); *Rosenthal v. Blum,* 529 S.W.2d 102, 104 (Tex.Civ.App. 1975). As in a Rule 10b–5 action, a plaintiff who establishes the elements of an action for negligent misrepresentation may recover out-of-pocket and consequential damages. Restatement (Second) of Torts, § 552B(1) comment a. The measure of damages under § 552B is the same as that explained in subsection (1) of § 549 of the Restatement (Second). The standard set out in § 549, in turn, is the same as the out-of-pocket measure of *Huddleston,* the difference between the price paid and the actual value of what was purchased on the basis of the misrepresentation. As indicated in our prior discussion, appellants failed to establish damages under this standard inasmuch as they proceeded under a theory that their entire investment was worthless.[7]

---

6. The parties do not dispute the applicability of Texas law to this issue or to the breach of fiduciary duty issue.

7. Appellants argue that *Sedco International, S.A. v. Cory,* 522 F.Supp. 254 (S.D.Iowa 1981), *aff'd,* 683 F.2d 1201 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982), supports their position that the value of their leases

Section 552B(1)(b) also permits the recovery of consequential damages incurred as a result of a plaintiff's reliance upon a negligent misrepresentation. As we have pointed out previously in this opinion appellants did not, however, introduce any evidence to prove that any consequential damages were proximately caused by its reliance on BancTexas' misrepresentations. For the reasons indicated in our discussion of appellants' securities claim, we affirm the district court's ruling on this issue as well.

### C. Breach of Fiduciary Duty Claim

 The district court also entered judgment for BancTexas on the appellants' claim that BancTexas breached a fiduciary duty to appellants notwithstanding the jury's verdict to the contrary. We hold that the district court's ruling on this issue as a matter of Texas law was correct.

Under Texas law there is no general fiduciary obligation between a lender and a borrower or between business parties. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962). A fiduciary relationship may arise in some circumstances, however, when " 'moral, social, domestic or purely personal' relationships" are shown to exist between the parties. *Id.* Similarly, the existence of "a professional and close personal friendship" between the parties may also establish a fiduciary relationship. *Trevino v. Sample*, 565 S.W.2d 93, 96 (Tex.Civ. App.1978). Subjective reliance or trust alone, however, is insufficient to establish a fiduciary relationship. *Thigpen*, 363 S.W.2d at 253. Nor are extensive prior dealings by themselves enough. *Id.* Under Texas law, appellants dealings with BancTexas cannot be said to have created any fiduciary obligations between the parties.

Appellants, nonetheless, argue that a fiduciary relationship did exist despite the fact that they had had no prior dealings or any prior relationship with BancTexas. They argue that Stuart misrepresented the financial condition of the bank's customer, Wells-Battelstein, in order to generate business for themselves and to help Wells-Battelstein, a major client. To advance this argument appellants rely upon several cases decided outside of Texas. *See Richfield Bank and Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976); *First National Bank in Lenox v. Brown*, 181 N.W.2d 178 (Iowa 1970); *Earl Park State Bank v. Lowmon*, 92 Ind.App. 25, 161 N.E. 675 (1928) (en banc).

As pointed out by the district court, however, *Richfield Bank* and *First National Bank* are not relevant to this case. In *First National Bank*, a fiduciary duty was established on the basis of the borrower's subjective trust. In *Richfield Bank*, liability was found based upon another theory of fraud, not a breach of fiduciary duty.

We also agree with the district court's discussion as to the third case, *Earl Park State Bank*. In that case, a bank was held liable to a borrower for its officer's failure to disclose a known material fact where there had been a long-standing relationship between the bank officer and the borrower, and where the officer had recommended the loan and had negotiated its terms. Under these circumstances, we conclude that a fiduciary relationship would have been found to exist under Texas law.

### D. Dismissal of the Third Party Complaint

 The district court also granted BancTexas' motion to dismiss the appel-

---

was zero. *Sedco* concerned a claim by an investor alleging that he had been wrongfully induced by the defendant to join a Middle East oil venture that subsequently failed, resulting in substantial financial losses to the investor. The district court awarded the investor damages as if the value of his interest in the venture was zero.

Appellants' reliance on this case, however, is misplaced. The investor in *Sedco* did not pur-

chase interests in oil and gas leases as appellants did here. In *Sedco*, instead, the venture was a contract with the government of Qatar to reenter oil wells owned by the government and restart production. When the government of Qatar decided to terminate the agreement, the venture retained no interests in any of these wells. Unlike appellants' situation here the venture in *Sedco* truly owned nothing.

lants' third party complaint against it severed from the California action and consolidated with this case. The district court did so because of appellants' failure to request that any instructions concerning the third party action be submitted to the jury.

The district court submitted this case to the jury in the form of a series of specific questions on all material factual issues. Fed.R.Civ.P. 49. A party's failure to object to the omission of any issue in these questions is considered a waiver. *Molex, Inc. v. Nolen,* 759 F.2d 474, 478 (5th Cir.1985).

Appellants argue that in this particular situation their failure to object to the omission of any issues with regard to their third party complaint against BancTexas did not constitute a waiver. The underlying claims in appellants' third-party action against BancTexas, they argue, were identical to those presented in appellants' original action. Thus, they insist that there was no need to present additional questions to the jury on these issues.

The breach of fiduciary duty claim was dismissed on its merits in appellants' original action against the bank. So additional questions to the jury were irrelevant. The rule 10b–5 and negligent misrepresentation claims, however, were dismissed for a lack of evidence as to damages. Underlying liability on these claims was established. With regard to these issues then additional jury questions on liability under the third party complaint were not required.

Jury questions, nonetheless, were still necessary to determine the extent of indemnity or contribution owed by the bank to appellants. As appellants requested no questions on these points, they waived their third-party claims against BancTexas on these issues. Contrary to appellants' argument, a finding of liability on the third-party action would not necessarily make BancTexas responsible for all possible damages that appellants might have been ordered to pay the investors in the California suit.

We note briefly that appellants also argue that the district court was not authorized to enter judgment in a separate action, the third party action, on the basis of the special verdict. The contention is without merit. The third-party action was not a separate action, but one consolidated with the original case in Texas in order to sort out liability as completely as possible between these same parties on issues arising out of the same circumstances and transactions. A district court has the authority to grant judgment upon a third-party complaint made conditional upon the outcome of the original action. *See* 6 Wright & Miller *Federal Practice and Procedure: Civil,* § 1451.

### III.

For the foregoing reasons we affirm the judgment of the district court.

AFFIRMED.