412

Robert GATZKE et al., Plaintiffs,

v.

Ben OWEN et al., Defendants.

No. EC 74–71–K.

United States District Court,
N. D. Mississippi, E. D.

Dec. 17, 1975.

Roy O. Parker, Tupelo, Miss., for plaintiffs.

William J. Threadgill, Columbus, Miss., for Ben Owen.

Thomas J. Tubb, West Point, Miss., for Mrs. Rosamond.

Robert D. Patterson, Aberdeen, Miss., for Eric Manning.

Hunter M. Gholson, Columbus, Miss., for Mrs. Rosamond and Mr. Manning.

MEMORANDUM OPINION

KEADY, Chief Judge.

The court has for determination the motion of the named plaintiffs, Robert Gatzke and John Bunton, partners in Gatzke and Bunton Lease-A-Car, and R and S Lease-A-Car, Inc., to maintain a class action on behalf of all persons fraudulently and by means of false representations induced to enter into franchise agreements for the leasing of motor vehicles as dealers for Lease-A-Car of Monroe, Inc., and Lease-A-Car, Inc. (L-A-C), two Mississippi corporations allegedly under the control of defendants as officers, directors and stockholders. Plaintiffs assert that class action prerequisites of Rule 23(a), F.R.Civ.P., are present and the action should be maintainable under subdivision (b)(1)(B). Defendants oppose class action certification on several alternative grounds.

The complaint charges that the defendants, Ben Owen, Eric Manning, Lil-

la Pratt Rosamond, William I. Rosamond (now deceased), and George Creighton, commencing on or about July 1, 1968, and continuing thereafter for three years, acting through L-A-C, devised a scheme to defraud persons residing throughout the United States by using the mails and other instrumentalities of interstate commerce to represent that they might obtain appointment as L-A-C dealers and enjoy average yearly earnings in excess of $40,000; that defendants represented that L-A-C would appoint one dealer within a specified territory to handle the leasing of automobiles and trucks which L-A-C would purchase and finance for the dealer, and that leases made to customers would be at competitive rates, and that L-A-C would provide sales materials and national advertising, train the dealer in calculating leasing rates, and obtain sub-dealers within the assigned territory to assist in procuring prospects to lease vehicles. The complaint alleged that pursuant to this plan, the defendants, by means of various false representations, sold or caused to be sold L-A-C dealer franchises to approximately 185 persons and firms located in all parts of the United States who paid varying sums of money for the franchises. It was further alleged that the L-A-C corporations were sham entities, that they were without financial means to purchase and finance automobiles and trucks for leasing by dealers, that cars could not be leased at competitive rates, and that the promised sales materials, national advertising, training, and sub-dealer assistance were not forthcoming, and that defendants, by participating in the fraudulent scheme, became individually liable.

The complaint charged violations of the federal security laws, § 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 CFR 240.-10b5, as well as common law fraud. Plaintiffs Gatzke and Bunton sought the recovery of $25,000 damages, including $1,500 paid as license fee, and other elements of actual as well as punitive damages. Plaintiff R and S Lease-A-Car, Inc., sought recovery of damages in like amount, including, however, a demand for $10,000 paid as license fee. Plaintiffs further alleged that "individual members of the class paid to the Defendants, through their sham corporation, from One Thousand Dollars ($1,000.00) to Sixteen Thousand Dollars ($16,000.00) for franchise fees", that each member of the class had been damaged in the amount of $10,000 because of injury to business reputation, embarrassment, and mental anguish, and each member was also entitled to recover $10,000 punitive damages because of defendants' fraudulent acts. The complaint estimated that total damages due the class for compensatory and punitive damages, including attorney fees, to be $4,000,000 subject to proof at trial as to the actual damage sustained by each member of the plaintiff class.

The material evidence on this motion shows that George Creighton, L-A-C's general manager, employed a sales force to contact anyone manifesting an interest in becoming a franchisee by replying to L-A-C's mailouts; that an L-A-C salesman would make personal contact with each prospect and arrange for individual sales presentations to the potential dealer; and at this initial meeting, usually taking place at a local motel, prospective franchisees were apprised of dealership advantages and opportunities, and what contributions L-A-C would make to the venture as well as the dealer's obligations. When the negotiations resulted in a dealer appointment, a written agreement confirming the understanding was signed by the licensee and accepted by L-A-C at its home office at Aberdeen, Mississippi. It appears that during the three-year period, franchise contracts were procured by 34 salesmen who traveled 20 states to consummate agreements. Ten salesmen were each responsible for obtaining only one contract; others had greater success, rang-

ing from 1 to 26 dealer appointments. The various dealer contracts as executed, though of similar import, were not the same, with many containing special modifications or clauses inserted by individual licensees. Interlineations and changes appear on a great many of the agreements which were executed on several types of forms employed by L-A-C. In some instances, the contracts were not executed until they were substantially revised by attorneys representing individual franchisees. As stated, those becoming dealers paid differing considerations for the L-A-C franchise, the amount of the license fee being dependent upon the size of the assigned territory, whether the dealership was to be exclusive or nonexclusive; in other cases, the amount paid was determined by direct trading or the prospect's cash position. Again, in some cases the consideration for the agreement was paid in cash, while in other instances L-A-C accepted part cash and took the balance in promissory notes. By the terms of most franchise agreements, however, the license fee was refundable to the dealer at the rate of $100 per leased vehicle until the entire fee was repaid, and a dealer would be obligated to lease annually a minimum number of cars during the five-year primary term of the agreement. The minimum number was not uniform and fluctuated considerably between the several contracts. Most contracts provided that prior to the expiration date of the agreement the contract might be terminated by either party or upon the dealer's death, in which case L-A-C would resell the license and, upon obtaining a new dealer, refund any unreturned license fee in accordance with a specified formula.

To qualify the case as a class action, plaintiffs concede they must show questions of law or fact common to the class, Rule 23(a)(2); and that adjudications with respect to individual members of the class would as a practical matter be dispositive of the interest of the entire class, Rule 23(b)(1)(B), or that questions of law or fact common to the class predominate over questions affecting only the individual members, Rule 23(b)(3). Defendants challenge the propriety of the class action on several grounds, principally that the class representatives have failed to show that defendants made standardized false representations applicable to the class as a whole, that the material representations allegedly made were parol, expressed by different persons, and necessarily varied throughout the class membership, that the primary issues of misrepresentation and reliance thereon must be viewed as many, individual issues, and not as a common question of fact or law. For reasons that follow, we are persuaded that the defendants are correct in their contention, and hold that the named plaintiffs have not met their burden of demonstrating that basic questions of commonality exist in this case. There has been no showing of particularized, specific false statements of material fact by defendants having the same influence or effect upon all members of the class.

The deposition testimony readily reveals basic dissimilarities respecting claims of misrepresentation. First, we consider the evidence as to the individual claim of Gatzke and Bunton. After Gatzke answered L-A-C's brochure which he received in the United States mail, he was contacted by L-A-C's salesman named Hal Robinson. A meeting was arranged between the two men at a motel near the city in the State of Michigan where Gatzke resided. At this meeting, Robinson orally made his "sales pitch" to solicit Gatzke's interest in becoming a dealer. Following this contact, Gatzke consulted his attorney and banker who made business reference calls to Monroe Bank & Trust Company at Aberdeen and Murdock Acceptance Corporation. Several meetings ensued before Gatzke consummated his deal, but not until he first secured an associate, John Bunton, to join him in the venture.

Gatzke testified that he entered the business arrangement because of the salesman's representations that through L-A-C the cars would be purchased and leased at cheaper prices and that good financing was readily available. After dickering with Robinson over the amount to be paid as the license fee, Gatzke agreed to pay $3,000, one-half payable in cash and the balance payable at the rate of $100 for each car leased. Also, the contract executed by Gatzke and Bunton was reviewed by their attorneys and contained various changes.

The underlying facts concerning the appointment of R and S Lease-A-Car, Inc., of Kansas, are somewhat different. Rex R. Robertson responded to L-A-C's mail brochure and was later contacted by L-A-C's salesman by the name of Dee Stodghill. Stodghill and Robertson met in a motel in Wichita, Kansas, where Robertson explained he would not be interested in a dealership unless L-A-C could locate another individual to go in partnership with him since he, Robertson, was interested only in investing money and wanted someone else to operate the dealership. It was Stodghill who procured Robert Starkey as a business partner for Robertson. There ensued discussions regarding the formation of R and S Lease-A-Car, Inc., as a corporation, the territory to be assigned to the dealership and the price to be paid for the license fee. Robertson called various business references supplied by Stodghill, including Kenneth Schultz, who was represented to be a successful dealer in Dearborn, Michigan. Upon Robertson's call Schultz recommended the venture highly. Schultz in fact was a dealer who had achieved only minimal success but he was paid an agreed amount by L-A-C for each person he might be able to influence in accepting a dealership. Subsequent meetings were held between Stodghill and Creighton on behalf of L-A-C and Messrs. Robertson and Starkey. After Robertson advised with his attorney and organized a corporation,

the firm paid $10,000 as the license fee for a Kansas dealership. In his deposition testimony, Robertson admitted that he was induced to enter into the contract because of the parol statements made to him by Stodghill and Creighton and also because Schultz assured him that good money could be made as a dealer. With respect to the inducing effect of the individualized, parol statements of Stodghill and Creighton, Robertson stated as follows: (96, 97)

"Q.  Then I take it that most of the inducement [to become a dealer] was the verbal discussions you had with Mr. Stodghill and Mr. Creighton . . . . ?

A.  You mean the inducement to get into this class action deal?

Q.  No, sir, the initial contract back in 1970.

A.  Oh, the inducement at that time was, of course, number one, the interviews with Stodghill and Creighton.

Q.  Yes, sir.

A.  Plus—

Q.  The terms of the contract?

A.  The investigation I made, the terms of the contract and plus the investigation I made which seemed to be positive in the areas and—

Q.  Yes, sir.

A.  —people that I contacted.

Q.  *You don't know what verbal representations, if any, were made to these other franchisees in the other states, do you?*

A.  No.

Q.  *So it could well be that some fellow in Indiana was told a different story, or had different representations made to him? It could be different from what was told to you?*

A.  Well, it could *be*." (Emphasis added)

Thus it is apparent that the named plaintiffs were induced to enter into franchise agreements with L-A-C largely

on the basis of individual, oral representations by L-A-C salesmen Robinson and Stodghill. Not only is there no showing that these representations were substantially identical in every L-A-C franchise solicitation, but the experiences of Gatzke, Bunton, and R and S Lease-A-Car, as well as the widely varying franchise contract terms, are evidence that the sale approaches and solicitation packages of defendants and their agents differed according to exigencies confronting the prospective franchisee. These variations are what make this a clearly inappropriate case for class action treatment.

In *Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880 (5 Cir. 1973), a 10b-5 and common-law fraud action, the plaintiff sought to represent a class of persons who had allegedly been induced to purchase common stock in Scientific Control Corporation by the fraudulent statements and misrepresentations of Merrill Lynch agents. The district court denied maintenance of the case as a class action because "there was no showing that the oral representations made to Simon by a Merrill Lynch salesman had been similarly made to other members of the purported class, and [because] plaintiff could not supply the required proof for the entire class on the issues of misrepresentation and omission." *Simon*, supra, at 882. The Fifth Circuit affirmed, noting that where there are material variations in the sales representations made by the defendant, and particularly where such representations are primarily oral rather than written, fraud cases may be ill-suited for class action treatment. The court observed that class action maintainability in these cases presupposes a set of relatively standardized material representations by the defendant, to which all members of the plaintiff class have been exposed. In the absence of such standardized conduct, consisting of representations by one party and exposure thereto by another, the commonality required by Rule 23(a)(2) simply does not exist. See also *Clark v. Watchie*, 513 F.2d 994, 999–1000 (9 Cir. 1975); *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1167–68 (S.D.N.Y.1974); *Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D.N.Y.1968); Rule 23, Advisory Committee's Official Note, 39 F.R.D. 98, 103 (1966).

Similarly, in *Morris v. Burchard*, 51 F.R.D. 530 (S.D.N.Y.1971), another 10b-5 and fraud action based on diverse oral representations akin to those of our case, the court denied class status in the following words:

"The alleged misrepresentations were not standardized; they appear largely to have been a disconnected series of oral statements, which must have varied from person to person and seemingly not made pursuant to a common course of conduct. No one of the variety of misstatements was necessarily brought to the attention of each individual purchaser. . . . The most that can be distilled from the elusive form of the allegations of the complaint is that the purchasers relied merely upon *oral* statements whose content extent and shades of meanings would as a practical probability vary in respect of each of the class members and with each of the defendants." 51 F.R.D. at 534.

Except for the multiplicity of defendants there, this language is as applicable here as in *Morris*.

The lack of standardization which the *Simon* and *Morris* courts found dispositive is significant because of its effect on the conduct of the litigation. Where individual class members have been induced by or exposed to no common representations or course of conduct at which to point, the question of misrepresentation and fraud—basic to the issue of liability—must be determined separately for each plaintiff. Further, such variations in the defendant's conduct with respect to each plaintiff would nec-

essarily individualize the fundamental question of the plaintiffs' reliance on the defendant's representations, and whether plaintiffs did in fact rely on any asserted misrepresentations.[1] This spectre of dozens, or hundreds, of individual fact determinations on issues central to the asserted causes of action may not be banished as an illusion. See *Lah v. Shell Oil Co.*, 50 F.R.D. 198 (S.D. Ohio 1970).

Further, the scope of the proposed class indicates that plaintiffs may reside in as many as 20 jurisdictions, each with its own common law of fraud and applicable statute of limitations.[2] Thus, questions of law as well as fact may also be highly diverse, if not individualized, with respect to many franchisees.

Aside from the obvious predominance of individual issues over questions common to the proposed plaintiff class in the case sub judice, the court doubts whether any class representative, however diligent, can adequately represent other class members with respect to claims based on such disparate factual circumstances. The burden would, we believe, be immense.

The class action has long been a useful tool for disposing of multiple claims so closely related that they may be conveniently lumped in one proceeding without doing violence to the interests of the parties. But the class action vehicle should not be made to carry a load heavier than that for which it was designed. Certification of this case as a class action would surely overburden this court's resources. Indeed, rather than acting as an instrument of convenience, this class action could create a juridical monster which would be virtually indigestible in any forum.

For the foregoing reasons, we decline to certify this action as a class action and hold that the named plaintiffs may prosecute their individual claims only.

---

1. While a showing of actual reliance on defendant's misrepresentations may no longer be necessary in proving 10b–5 violations, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), recovery under the state law fraud claim would require proof of reliance.

2. This assumes, without deciding, that Mississippi's conflict of law rules would mandate disposition of plaintiffs' claims by the law of the state of their residence, and in which the representations and contracts were made and largely to be performed.

See *Mitchell v. Craft*, 211 So.2d 509 (Miss. 1968).

