Dr. Sampat SHIVANGI and Dr. Udaya S. Shivangi, Individually and on Behalf of Others Similarly Situated, Plaintiffs,

v.

DEAN WITTER REYNOLDS, INC., and Thomas Aitken, and James Y. Palmer, Defendants.

Civ. A. No. J82–0367(B).

United States District Court, S.D. Mississippi, Jackson Division.

Aug. 27, 1985.

Michael Farrell, Jackson, Miss., for plaintiffs.

Kenneth A. Rutherford, Janice Holley Parsons, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

This matter is before the Court on the Defendants' Motion for Summary Judgment and the Plaintiffs' Motion for Class Certification. The Court having conducted a hearing on these Motions and having reviewed the substantial briefs and materials submitted by the parties with regard to these Motions, is now prepared to rule on the Motions.

## FACTUAL BACKGROUND

The Plaintiffs are two Jackson, Mississippi, doctors who opened an investment account with Dean Witter Reynolds in the Spring of 1981. Defendant Thomas Aitken was their account executive and Defendant James Y. Palmer was a Vice-President of Dean Witter in charge of Dean Witter's three Mississippi offices. According to the Complaint, Defendant Aitken called the Plaintiffs and recommended that they purchase 400 shares of Keldon Oil stock which the Plaintiffs did on May 13, 1981. Although the value of Keldon Oil stock rose briefly after the purchase, its price soon began a steady decline and the Plaintiffs sold their stock on the open market in December of 1981 at a loss.

The Complaint alleges violations of the Federal Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10(b)–5; violation of the Mississippi Securities laws, *Miss. Code Ann.* §§ 75–71–31 and 75–71–501 (1972); and violations of commonlaw, fraud, deceit and negligence.[1]

When effecting a trade on a national exchange such as the New York or the American Exchange, Dean Witter generally acts as an agent, effectuating sales of stock between customers A and B. Dean Witter's account executive receives a commission on the transaction, depending upon the account executive's productivity. This commission ranges from 2–3% of the price of the transaction. Stocks which are not traded on a national exchange may be traded over-the-counter. Dean Witter and others "make" a market in over-the-counter stocks by offering to buy and sell the stocks at prices published on a national automated computer quotation system (NASDAQ) created by the National Association of Securities Dealers (NASD). Dean

1. The Complaint alleges that the following activities of the Defendants were in violation of the above referenced standards of duty:

1. Illegal selling of Pryme Energy Resources stock on margin and then conversion of Plaintiffs' funds to pay for it.

2. Inadequate investigation before recommending Pryme Energy Resources and Keldon Oil stock as solid investments.

3. Failure to disclose (as to Keldon and other stocks in which Dean Witter made a market):
a. that the stocks were over-the-counter stocks;
b. that Dean Witter was a market maker;
c. that Dean Witter was acting as a principal in the transaction;
d. that Dean Witter offered a credit or bounty to brokers who sold stocks in which Dean Witter made a market.

4. Failure to execute purchase orders at the best price among market makers, i.e. Dean Witter used its own trader rather than one with the best price when it purchased stock on behalf of the Plaintiffs.

5. Recommendation of non-exempt and unregistered securities such as March Resources, Pryme Energy Resources, Keldon Oil Company, Locke Exploration and others in violation of the Mississippi Blue Sky laws. The Complaint seeks compensatory damages in an amount equal to all investments lost and in an amount equal to all funds converted by the Defendants', reimbursement of all commissions, credits or bonuses paid to the Defendants, punitive damages and costs, expenses and attorneys' fees.

Witter and other market makers in the over-the-counter market generally buy and sell these stocks for their own accounts. However, since they hold themselves out as being able to buy and sell the stocks at the market price, they are required to go outside their own account to purchase stocks on the market if they "sell short" in the stock.

Dean Witter is a market maker and has approximately 25 traders in its New York trading department and others in its San Francisco office. Each trader is assigned about 30 stocks to trade, and has use of approximately $500,000 of Dean Witter's capital to invest. There are over 2700 stocks on the NASDAQ system and Dean Witter makes a market in approximately 1,000 to 1,200 stocks. All over-the-counter trades in which Dean Witter is a market maker are handled on a principal basis, meaning that Dean Witter sells the stock to the customer out of its own inventory rather than acting as the agent of the customer, unless the customer specifically requests that the transaction be handled on an agency basis. Dean Witter's Jackson office manager estimated that 75–80% of the over-the-counter trades in which Dean Witter makes a market are handled on a principal basis.

Dean Witter's compensation for agency trades is referred to as "commission" and for principal trades it is referred to as "mark-up." Dean Witter's pricing policy generally results in a price savings to the customer when the transaction is handled on a principal basis as opposed to an agency basis, since the mark-up on a principal trade is rounded down to the nearest $\frac{1}{16}$ below the commission which would be charged if the transaction was handled on

an agency basis.[2] Dean Witter buys and sells at the best market price available for the stock based upon the NASDAQ quotes without regard to the price paid by Dean Witter for the stock.

Dean Witter aggressively markets the stocks in which it is a market maker through the use of an "Overnight Offering List." At the close of every trading day, each trader is required to place on the list five stocks in which he has 1,000 shares in inventory. Account executives around the country can review the list on their computer screens. This list shows the net price of each stock *and the account executive's sales credit,* that is, his compensation on each stock. Since Dean Witter owns these stocks, account executives can review the list on their computer screens and call customers to solicit trades after market hours. Dr. Sampat Shivangi testified, in fact, that Defendant Aitken called him about 7:30 a.m. to encourage him to buy Keldon Oil. Through the use of this Overnight Offering List, the account executive knows before he contacts a customer how great his sales credit on the transaction will be.[3] Sales of the stocks on the Overnight Offering List can produce substantially higher sales credits for the account executive than sales of other over-the-counter stocks, but not necessarily.

The Plaintiffs purchased Keldon stock for $17\frac{1}{2}$ per share for a total purchase price of $7,000, which was reflected on the confirmation slip they received within a few days of the transaction. The fact that Dean Witter acted as a principal in the transaction and was a market-maker in the security was stated on the confirmation slip, in conformity with Securities and Exchange Commission rules.[4] The Plaintiffs

2. For example, if the commission on an agency trade of 100 shares would be $55.00, the mark-up on a principal trade would be $50.00 ($55.00 rounded down to the nearest $\frac{1}{16}$).

3. Dean Witter representatives testified in depositions that 80% of the time the account executive knows the sales credit when he enters the order because he has looked at the inventory or has talked to the trader. The credit is shown on the computer list "because he wants to know what

he is going to be paid" Mullins dep. at 74, and the list "tells him [the account executive] how profitable it's going to be for him if the transaction goes through." Palmer dep. at 55.

4. It shall be unlawful for any broker or dealer to effect ... any transaction in ... any security ... unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing

allege that the commission on 400 shares of a $17\frac{1}{8}$ stock would be $154.70, of which the account executive would keep 30% to 40% as his compensation ($46.41–$61.88). In the case of the Keldon Oil stock, Dean Witter gave a sales credit on the transaction which included not only the mark up but also the spread. Dean Witter received a $2\frac{1}{8}$ spread plus the $\frac{3}{8}$ mark-up on the 400 shares, yielding a total sales credit of $1,000. The account executive, Aitken, received 40% of the sales credit, or $400. The basis of the Plaintiffs' suit is that the difference between $46.41 and $400.00 creates a conflict of interest in Dean Witter's compensation system which should be disclosed to customers.[5]

The sales credit on the sell side includes only the mark-down and not the spread. Therefore, an account executive gets about the same sales credit on both agency and over-the-counter principal trades when a customer *sells* a stock. The extra compensation only comes in when a customer *buys* a stock. The Jackson office manager explained why the account executive gets a bigger sales credit on the buy side:

> [T]he broker who is buying it is helping the trader out because he is taking inventory out of his inventory and he is not charging capital expenses and risk. He is taking the risk out of it. So, the Buyer is often paid more.[6]

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants have moved for summary judgment on the following issues:

> 1. Whether he is acting as agent for such customer ... or as principal for his own account; and
>
> .    .    .    .    .
>
> 5. If he is acting as principal for his own account
>
> .    .    .    .    .
>
> (ii) In the case of a transaction in an equity security, whether he is a market maker in that security.

Rule 10B–10(a), 17 C.F.R. § 240.10b–10(a) (1983).

**5.** Account executives generally receive much more compensation from market making—principal trades because the "revenue" or "sales credit" includes the mark-up and the spread. In

1. Whether the Federal Securities laws require Dean Witter and other market makers to disclose the amount of compensation paid to the account executives in over-the-counter transactions in which Dean Witter acts as a principal and involving trades of stock on its Overnight Offering List;

2. Whether common law agency principles require Dean Witter to state to its customers that it is acting as a principal in the transaction in some manner other than stating on the face of the confirmation slip that it is a market maker and acting as a principal, and

3. Whether the Mississippi Blue Sky laws require disclosure of the amount of compensation paid to the account executive in a transaction in which Dean Witter acts as a principal.

These issues will be discussed separately.

### FEDERAL SECURITIES LAWS

Section 10(b) of the 1934 Securities Exchange Act provides:

> It shall be unlawful for any person ... (b) to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive devise or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

addition, the payout is fixed at 40%. In the Plaintiffs' trade, the $2\frac{1}{8}$ spread ($15.00 bid—$17\frac{1}{8}$ ask) and a $\frac{3}{8}$ mark-up totaled a sales credit of $2½. On 400 shares the sales credit was $1000, 40% of which ($400.00) went to the account executive, Aitken. If the same stock had been traded on an agency basis, the commission on 400 shares of $17\frac{1}{8}$ stock would have been $154.70, and Aitken would have received between 30% and 40% of that—a range of $46.41 to $61.88. Aitken's compensation on the Keldon Oil transaction was somewhere between 6.4 and 8.6 times his compensation on a similar agency trade.

**6.** James Palmer Deposition at 59.

15 U.S.C. § 78j. In addition, Securities Exchange Commission Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10(b)–5.

■ The Court is of the opinion that the extra compensation received by Dean Witter account executives in principal trades in which Dean Witter makes a market, over and above the compensation normally received in agency trades, creates a potential conflict of interest which is a material fact which ought by law to be disclosed to investors. Since this appears to be a case of first impression, the Court analyzes the following cases.

In an analogous context involving a shareholder's suit challenging the sufficiency of the disclosure in a proxy statement, the Supreme Court defined a material fact as follows:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all of the circumstances, the omitted fact would

have assumed actual significance in the deliberations of the reasonable shareholder.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[7] In *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981), *rev'd. in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Fifth Circuit stated:

In this Circuit, the test of materiality [under Rule 10b–5] is whether a reasonable man would attach importance to the fact misrepresented in his course of action.... *Falls v. Fickling,* 621 F.2d 1362, 1365 n. 9 (5th Cir.1980).

■ Courts have uniformly held that economic conflicts of interest create material facts which must be disclosed to investors. A person recommending a stock must disclose if he will gain financially from the sale above and beyond normal compensation.

In *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) an investment adviser personally purchased stock before recommending it in a published newsletter to 5,000 subscribers. After an anticipated increase in activity caused by his own published recommendation, the investment adviser would sell the stock at a profit. The Supreme Court noted:

An adviser who ... secretly trades on the market effect of his own recommendation may be motivated—consciously or unconsciously—to recommend a given security not because of its potential for long run price increase (which would profit the client), but because of its potential for short run price increase in response to anticipated activity from the recommendation (which would profit the adviser). An investor seeking the advice of a registered investment adviser must ... be permitted to evaluate such overlapping motivations, through appropriate

**7.** "TSC Industries arose under § 14a of the Securities Exchange Act of 1934, but the test for materiality is the same under all of the securities statutes." *Austin v. Loftsgaarden,* 675 F.2d 168, 176 n. 17 (8th Cir.1982).

disclosure, in deciding whether an adviser is serving two masters or only one, especially if one of the masters happens to be economic self-interest.

*Id.* at 196, 84 S.Ct. at 285. The Court described the potential for abuse in such a situation as follows:

> [W]henever advice to a client might result in financial benefit to the adviser— other than the fee for his advice—"that advice to a client might in some way be tinged with that pecuniary interest [whether consciously or] subconsciously motivated...."

*Id.* at 188, 84 S.Ct. at 281 (citation omitted). The Court continued:

> The Investment Adviser's Act of 1940 thus reflects ... a congressional intent to eliminate, or at least to expose all conflicts of interest which might incline an investment adviser consciously or unconsciously—to render advice which was not disinterested.

*Id.* at 191–92, 84 S.Ct. at 282–83. In concluding that the economic interest created a conflict which must be disclosed, the Court held:

> It is the practice itself, however, with its potential for abuse, which "operates as a fraud or deceit" within the meaning of the Act when relevant information is suppressed.
>
> ...
>
> Experience has shown that disclosure in such situations, while not onerous to the adviser, is needed to preserve the climate of fair dealing which is so essential to maintain public confidence in the securities industries and to preserve the economic health of the country.

*Id.* at 200–01, 84 S.Ct. at 287–88.

In *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir.1970), the Second Circuit held that a securities broker/dealer must disclose to its customers when it recommends a stock in which it is a market maker. The Court noted:

> [D]isclosure of the fact would indicate the possibility of adverse interests which might be reflected in [the] recommendations.... An investor who is at least

informed of the possibility of such adverse interest, due to his broker's market making in the securities recommended, can question the reasons for the recommendations. The investor ... must be permitted to evaluate overlapping motivations through appropriate disclosures, especially where one motivation is economic self-interest.

*Id.* at 1172. *Chasins* was a landmark decision requiring securities broker/dealers to disclose the fact that they were recommending a stock in which they were a market maker. In the instant case, Dean Witter disclosed to the Plaintiffs the fact that it was a market maker. A similar and related economic conflict of interest exists, however, with regard to the extra compensation received by the Plaintiffs' account executive for recommending stocks in which Dean Witter was a market maker and which were on its Overnight Offering List. That extra compensation also should have been revealed to the Plaintiffs.

*Chasins* was adopted with approval in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) which involved the sale of stock by two bank officials who "were active in encouraging a market for the UDC stock among non-Indians ... by soliciting and accepting standing orders from non-Indians [for which they received] commissions and gratuities." *Id.* at 152, 92 S.Ct. at 1471. The Court observed:

> The individual defendants, in a distinct sense, were market makers, not only for their personal purchases ... but for the other sales their activities produced. This being so, they possessed the affirmative duty under the Rule [10b–5] to disclose this fact to the mixed-blood sellers. *See Chasins v. Smith, Barney & Co.*

*Id.* at 153, 92 S.Ct. at 1472. The Court concluded that a market maker had an "affirmative duty under the rule [10b–5] to disclose" that it was a market maker *and* that "the sellers had the right to know that the defendants [who were market makers] were in a position to gain financially from their sales...." *Id.* In *Zweig v. Hearst*

*Corp.*, 594 F.2d 1261 (9th Cir.1979), a newspaper columnist personally bought stock before recommending it in his newspaper column. The court held:

> The holding in *Capital Gains* was limited to the duties imposed upon investment advisers by the 1940 Act. The plaintiffs here do not argue that Campbell was an investment adviser as defined in that statute; thus, *Capital Gains* is not controlling. But the failure to bring the case within the Investment Adviser's Act does not mean that the claim under Section 10(b) and Rule 10b–5 should fail. We hold that as applied to the facts, we must assume in this case, the Investment Adviser's Act was not meant to limit the Securities Exchange Act or Rule 10b–5. Instead, we believe that these provisions complement each other and provide different means to curb slightly different types of "fraud or deceit."

A number of cases since *Capital Gains* suggest that Rule 10b–5 requires the disclose of conflicts of interest in situations similar to the facts of this case. In *Chasins v. Smith, Barney & Co.*, supra, the court held that a brokerage firm had the duty to disclose its "market making" activities in certain stocks to a client who purchased those stocks on the firm's recommendation. The court upheld a judgment for damages suffered by the client, on the ground that the firm's failure to inform the customer of the possible conflict of interest was an omission of a material fact in violation of Rule 10b–5.

The court's holding in *Chasins* could be interpreted narrowly, as imposing a duty to disclose conflicts of interest only upon brokers acting within a traditional broker-client relationship. However, the Supreme Court's opinion in *Affiliated Ute* ... illustrated that this duty may be imposed on others as well....

We find Campbells' activities sufficiently similar to those of the bank employees in *Affiliated Ute Citizens* to impose on him a duty to disclose to his readers his stock ownership, his intent to sell when the market price rose, and the practice of reprinting his articles. Columnist, like transfer agents, ordinarily have no duty to disclose facts about personal financial affairs or about the corporations on which they report. But there are instances in which Section 10(b) and Rule 10b–5 require disclosure. Here, as in *Affiliated Ute Citizens*, the defendant assumed those duties when, with knowledge of the stock market and intent to gain personally, he encouraged purchases of the securities in the market.

*Id.* at 1267–68. The court held that this information was material, noting:

> The facts revealing Campbell's lack of objectivity were material.... Reasonable investors who read the column would have considered the motivations of a financial columnist such as Campbell important in deciding whether to invest in the companies touted.... [T]he omitted facts ... were material.... Campbell ... must be held liable for intentionally withholding them.

*Id.* at 1266. The court concluded by holding:

> This withheld information did not relate directly to the company's value and expected performance, but it was necessary to avoid misleading Campbell's audience on the reliance they could place on the column. We hold that in failing to disclose these facts, Campbell violated Section 10(B) and Rule 10b–5 just as corporate insiders do when they withhold material facts.

*Id.* at 1267. In *Steadman v. SEC*, 603 F.2d 1126 (5th Cir.1979) the Fifth Circuit held that a mutual fund adviser must reveal that he obtained substantial loans from certain banks when he recommended to the funds he managed that they transfer their checking accounts to those banks. The court observed:

> The Commission found that this was material information that Steadman had a duty to reveal [under *inter alia* § 10b of the 1934 Security Exchange Act and Rule 10b–5]....

The Commission concluded that Steadman's practice of borrowing heavily, for himself and SSC, from the same banks where the funds had accounts created a potential for subordinating the funds' interests to his own. Deposits are the source of money that banks lend out for interest. Steadman needed large loans. His self-interest in currying the good favor of the banks might have led him, the Commission speculated, to keep unduly large amounts idle in the funds' non-interest bearing accounts to the benefit of the banks but the detriment of the funds' shareholders. The SEC made no finding that this had in fact occurred and specifically declined to find that the funds' custodial accounts were a quid pro quo for the loans. Regardless of whether there was a connection between the loans and the accounts, the Commission decided that "Steadman had disabled himself from looking at the funds' checking account balances in a wholly disinterested way, with an eye single to the funds' best interest. Investors had a right to know this."

. . . . .

[The SEC] decided that, under the circumstances of this case, the potential for Steadman's abuse of his influence over where the funds did their banking was sufficiently great that shareholders would want to know about the loans. That finding is not wrong as a matter of law, and we affirm it.

*Id.* at 1129–30. In *Sutton v. Shearson, Hayden, Stone, Inc.*, 490 F.Supp. 98 (S.D. N.Y.1980), a broker/dealer had settled customer complaints against an account executive and had then required the account executive to repay the amounts out of his future commissions. The court held that the account executive thus had an incentive to churn accounts and that this conflict of interest should have been disclosed to the broker/dealer's customers.

In *Barthe v. Rizzo*, 384 F.Supp. 1063 (S.D.N.Y.1974), a security salesman induced a customer to invest $100,000 without disclosing that he owned almost half the shares of the company and stood to gain from the sale. The court held that the customer "was entitled to know that [the securities salesman] was in a position to gain financially from the deal" *Id.* at 1067, and that the financial self-interest of the salesman was material because a reasonable man might have declined the recommendation had he known the salesman stood to gain personally. *Id.* at 1068.

As the Supreme Court noted in *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), "A fundamental purpose, common to these [securities] statues, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."

The Court is of the opinion that this standard may well have been violated in the instant case and that, as a result, Defendant's Motion for Summary Judgment declaring this non-disclosure to be non-violative of the federal securities laws must be denied.

## COMMON LAW AGENCY

The Plaintiffs do not deny that the notification they received in their sales confirmation slip a few days after the transaction which informed them that Dean Witter acted as a principal in the transaction was in conformance with SEC rules and regulations.[8] The Plaintiffs' sole contention here

---

**8.** Rule 10b–10(a) provides that a broker or dealer, prior to the completion of a transaction, must give a customer written notification stating whether the broker or dealer is acting as agent for the customer, or as principal for his own account.

Rule 10b–10(d) states that, for purposes of Rule 10b–10, completion of the transaction has the meaning stated under Rule 15c1–1. Rule

15c1–1 provides that completion of the transaction means the time when the customer pays the broker any part of the purchase price or, if payment is effected by a bookkeeping entry, the time when such entry is made. 17 C.F.R. § 240.15c1–1(b)(1) (1984). It is undisputed that Plaintiff received a confirmation slip with the requisite information prior to the "completion

is that the common law places a duty upon Dean Witter to divulge that it is acting as a principal *prior* to the placement of the order for the stock. The Plaintiffs are, therefore, asking this Court to hold that the common law places a more stringent duty upon the broker than that imposed by the federal securities laws. Plaintiffs cite no relevant authority in support of this proposition. To the contrary, this Court is influenced by the Ninth Circuit decision in *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605 (9th Cir. 1983) in which the court was presented with the question of whether the common law required disclosure that a stock broker acted as a principal in purchasing shares prior to the execution of the trade. The court concluded that advance disclosure was not required since the broker had fully complied with all SEC rules governing disclosure, and held that the common law imposed no greater duty. *Id.* at 606–08.

■ The Court concludes therefore, as a matter of law, that, to the extent the Plaintiffs' claim of violation of the common law of agency is limited to the *timing* of the disclosure of the fact that Dean Witter was acting as a principal in the transaction, the common law imposes no greater duty than the federal securities law, and the Defendants are entitled to summary judgment on this issue.

## MISSISSIPPI SECURITIES LAWS

Mississippi Securities law is substantively identical to Rule 10b–5. *Miss.Code Ann.* § 75–71–501 (Supp.1985) provides:

It is unlawful for any person, in connection with the sale or purchase of any security, directly or indirectly,

(1) to employ any device, scheme or artifice to defraud;

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Sub-paragraph 2 above was added in March, 1982, after the Plaintiffs made the subject stock purchases and therefore is not applicable in this proceeding.

The Defendants' Motion for Summary Judgment as to the Mississippi Blue Sky laws is based on two grounds:

1. That the transaction was exempt from the Mississippi Blue Sky laws pursuant to *Miss.Code Ann.* § 75–71–53(10) (1972); and

2. That the Plaintiffs, who sold the Keldon Oil stock without retendering it to Dean Witter, have no remedy under *Miss.Code Ann.* § 75–71–31 (1972) which provides recision of the transaction as the sole remedy for violation of the antifraud provisions.

■ *Miss.Code Ann.* § 75–71–53(10) (1972) provides that the sale of a security by a registered dealer is exempt from the Mississippi Blue Sky laws if information concerning the issuer of the security is contained in a recognized manual of securities at the time of sale. Defendants have produced an affidavit from Peyton D. Prospere, Assistant Secretary of State, Securities Division, of the State of Mississippi in which he identifies the General Rules and Regulations adopted under the Mississippi Securities Law in effect during the relevant time period which provide that Moody's OTC Industrial Manual is a recognized manual of securities within the meaning of *Miss.Code Ann.* § 75–71–3 (1972). The Defendants then produced affidavits from Patricia Beard, Librarian for the Jackson, Mississippi Metropolitan Library System and Ruth Ann Grant, Acquisitions Coordinator of the Jackson Metropolitan Library System to the effect that the 1980 edition of Moody's OTC Industrial Manual was received by the Jackson Metropolitan Library System in September, 1980, and the 1981 edition of Moody's OTC Industrial Manual was received by the Jackson Metro-

of the transaction" as that term is defined by Rule 15c1–1.

politan Library System in September, 1981. The Plaintiffs have produced no counter affidavits or evidence to refute the applicability of the § 75–71–53 exemption and the Court is of the opinion that the exemption applies in this case.

■ Furthermore, since the sole remedy for violation of the Mississippi statute involved is recision, and since the Plaintiffs did not retender their stock, but instead sold it on the open market, they no longer have a remedy under the Mississippi Blue Sky Laws. *See, e.g., Sloane v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 221 So.2d 451 (Fla.D.Ct.App.1969) (applying Florida securities law identical in all relevant respects to Mississippi's Blue Sky Laws); *Hart v. Dean Witter Reynolds, Inc.*, no. J81–0599(B) (S.D.Miss. Mar. 1984) (verdict granted for defendant on this issue).

The Court is of the opinion that the Defendants are entitled to summary judgment on this issue as a matter of law.

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The Plaintiffs seek to certify two classes:

A.   A nationwide class of all Dean Witter customers who bought Keldon Oil from Dean Witter acting as a principal and a market maker. Dean Witter made a market in Keldon Oil from approximately February, 1981 through April, 1983.

B.   A Mississippi class of all Dean Witter customers in Mississippi who bought any OTC stock from Dean Witter acting as a principal and a market maker since the effective date of Dean Witter's current Net Pricing Policy, i.e. July, 1980. The Plain-

tiffs seek certification under F.R.Civ.P. 23(a)[9] and Rule 23(b)(3)[10].

■ The plaintiff has the burden of proving these requirements, *see, e.g. Stewart v. Winter*, 87 F.R.D. 760, 768 (N.D. Miss.1980), *aff'd.*, 669 F.2d 328 (5th Cir. 1982), and in order to certify a class, the proposed class must meet all four conditions stated by Rule 23(a). *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 810 n. 9 (5th Cir.1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605. In addition to meeting all of the requirements of Rule 23(a), the proposed class must meet one of the requirements of Rule 23(b), in this case the requirements set forth in subparagraph (3) of Rule 23(b). *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 315 (5th Cir.1978).

Since the Court is of the opinion that the issue of whether the class satisfies the requirements of Rule 23(b)(3) with regard to the predominance of common questions of law or fact is dispositive in this case, the Court will examine class certification primarily from this standpoint.

The evidence thus far before the Court indicates that the relationship between Dean Witter account executives and their customers is a highly individualized relationship. The contacts between the account executive and customer are generally by telephone and almost entirely oral. The representations made by the account executive and the information conveyed by the account executive to each customer varies with respect to that customer's experience, financial condition, interests and inclination.

---

9.   Rule 23(a) provides:

Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all, only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

10.   Rule 23(b) provides in pertinent part:

Class actions maintainable. An action may be maintained as a class action if the prerequisite of subdivision (a) are satisfied and, in addition ... (3) the Court finds that the questions of law or fact common to the members of the class *predominate* over other questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy.

The Plaintiffs attempted through the use of a national survey of Dean Witter brokers conducted by Dr. Lloyd Roberts to establish that 72% of the time Dean Witter account executives do not volunteer in advance the amount of their compensation or sales credit on OTC stocks in which Dean Witter is a market maker unless this information is requested by the customer. Interestingly, the survey indicated that 54% of the Dean Witter brokers polled did from time to time disclose the amount of their compensation to prospective clients prior to the purchase of the OTC stock in which Dean Witter made a market, even if the client did not request this information. Fourteen percent of the brokers surveyed always disclosed this information. The survey indicated that 16% of the time the customer inquired about the compensation of the broker, in which case the amount of compensation was revealed. In an additional 28% of the time, the broker would reveal the amount of his compensation without being asked by the customer. Thus it appears that in approximately 44% of the cases, the broker would reveal the amount of compensation or sales credit to the customer prior to execution of the trade. The Plaintiffs' own survey undercuts their contention that nondisclosure of compensation is a uniform practice by Dean Witter.[11]

For purposes of class certification, it is not enough for the Plaintiff to state a cause of action on his own behalf against the Defendants. He must state a claim common to all proposed class members. *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 158–59, 102 S.Ct. 2364, 2371–72, 72 L.Ed.2d 740 (1982) (class certification denied in employment discrimination action where plaintiff failed to prove commonality of facts). One of the requirements for a 10b–5 violation is that the misrepresentation or omission be accompanied by the requisite scienter. In

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) the Supreme Court held that mere negligent misrepresentation or omission was insufficient and that scienter was required for a 10b–5 violation. The facts in the instant case do not sufficiently establish that omissions by Dean Witter account executives to customers other than the Plaintiffs were accompanied by the requisite scienter. In *Gelman v. Westinghouse Electric Corp.*, 73 F.R.D. 60, 67 (W.D.Pa.1976) the existence of individual questions of scienter was held to be sufficient to preclude class certification.

In *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir.1973) the Fifth Circuit upheld the denial of class certification on the basis of the plaintiff's inability to prove any standardized misrepresentations or omissions by Merrill Lynch account executives. The plaintiff's proof as to information *he* received in conversations with a Merrill Lynch account executive concerning the stock was held insufficient to establish commonality for class certification purposes. *Id.* at 882–83. Similarly, in *Gatzke v. Owen*, 69 F.R.D. 412 (N.D.Miss.1975), the court denied class certification in a Rule 10b–5 case where representations made by the defendants were oral, made by various representatives of the defendant, and varied with the particular sales situation. The court stated:

> Not only is there no showing that these representations were substantially identical ... but ... [there is] evidence that the sale approaches and solicitation packages of defendants and their agents differed according to exigencies confronting the prospective franchisee. These variations are what make this a clearly inappropriate case for class action treatment.

*Id.* at 416. In *Clark v. Watchie*, 513 F.2d 994 (9th Cir.1975), the court denied class

---

**11.** Rather than accept the findings of the survey on behalf of either the Plaintiffs or the Defendants, however, the Court is inclined to disregard it altogether since the survey was conducted in the spring of 1985, long after the transaction the Plaintiffs complain of occurred in the spring of 1981. There was no showing by the Plaintiffs that the policy and practices of Dean Witter brokers were the same in 1981 as they are at present.

certification in another case in which the plaintiffs failed to show any standard misrepresentations or omissions in connection with the sale of securities. The court noted:

> Appellants contend that we should hold that common questions ́ predominate. They reason that it is important that the presentations of some salesmen may have differed from others only if the element of reliance is a prerequisite to ultimate liability. In support of their contention that reliance is not an element in a 10b–5 suit, Appellants cite *Affiliated Ute Citizens v. United States....*
>
> In so arguing, Appellants misconceived the issue. Although they might not have to establish reliance to ultimately succeed in the suit, Appellants must show, as a condition to class status, that any misrepresentations or non-disclosures were common to the class. They have not done so for they have not shown that the alleged misrepresentations and non-disclosures involved every [member of the proposed class].

*Id.* at 999–1000. *Accord, Seiler v. E.F. Hutton & Co., Inc.,* 102 F.R.D. 880, 891 (D.N.J.1984) (class certification inappropriate where misrepresentations are oral and non-uniform); *Reichert v. Bio-Medicus, Inc.,* 70 F.R.D. 71, 76 (D.Minn.1974) (element of predominance not met where different representations made by different individuals to different purchasers at different times and under different circumstances); *Moscarelli v. Stamm,* 288 F.Supp. 453, 562–63 (E.D.N.Y.1968) (where dealings between broker and customer are of personal, individualized nature as opposed to standardized misrepresentations, omissions in a prospectus or other written document, class action is improper.) [12]

■ Having reviewed in great detail the evidence in support of and in opposition to the Plaintiffs' request for class certification, the Court is convinced that individual questions and issues predominate in this action, thus precluding certification of either of the requested classes. The Court is of the opinion that the following individual issues, among others, compel this result: the nature of the relationship between the individual client and the individual account executive; the sophistication and knowledge or lack thereof of the client regarding market making and account executive compensation; whether or not the broker recommended the stock to the client or the client ordered the stock without an opinion from the broker; the *scienter* or intent to defraud on the part of the account executive with respect to the client; the reliance by the client on the alleged omission in selecting and purchasing the stock or in deciding if and/or when to sell the stock; other claims which prospective plaintiffs may have regarding the purchase of Kel-

**12.** In support of class certification, the Plaintiffs rely primarily upon the case of *In Re Scientific Control Corp. Sec. Litigation,* 71 F.R.D. 491 (S.D. N.Y.1976), *consent settlement approved,* 80 F.R.D. 237 (S.D.N.Y.1978). Although the New York Court certified a class with respect to the issue involved in the case *sub judice,* i.e. extra compensation received by account executives in over-the-counter principal transactions, this Court is convinced that there has been an insufficient showing of standardized representations or omissions in the instant case to support a finding that common questions of fact or law predominate and make class certification a superior means for handling this case. In *Seiler v. E.F. Hutton & Co., Inc.,* 102 F.R.D. 880 (D.N.J. 1984) for instance the court noted:

> It is the general rule that an action based substantially on oral rather than written communication is inappropriate for treatment as a class action....

. . . . .

It is part of the plaintiff's overall burden in this Rule 23 motion to demonstrate that the defendant's communications to the proposed class were uniform in nature. As noted in *Miller v. Central Chinchilla,* 66 F.R.D. 411 (S.D.Iowa 1975)

In the absence of any demonstrable standardized communications ... the nature of the representations made is a factual question which must be answered on an individual basis, plaintiff by potential plaintiff.

. . . . .

In situations such as the case at bar, where it is alleged that a brokerage firm ... has defrauded a group of investors, the courts have generally denied class certification because of the highly individualized nature of the communications of the defendant's employees with their clients.

*Id.* at 888–89.

don Oil or other over the counter stocks[13]; affirmative defenses such assumption of the risk, waiver, ratification and statutes of limitations; and individual questions of damages.[14]

For the reasons set out hereinabove, the Court is of the opinion that the Plaintiffs' Motion for Class Certification must be denied.

### CONCLUSION

The Defendants' Motion for Summary Judgment that Dean Witter has no obligation under the Federal Securities Laws to disclose the amount of compensation paid to its account executives in transactions in which Dean Witter acts as a principal in over-the-counter trades in which it acts as principal and involving trades of stocks on the Overnight Offering List is denied. The Defendants' Motion for Summary Judgment that Dean Witter did not violate common law agency principals in informing its customers that it acted as a market maker and principal only through the confirmation slip which was delivered to the customer after the execution of the trade is hereby granted. The Defendants' Motion for Summary Judgment that it did not violate Mississippi Blue Sky Laws with regard to disclosure of the amount of compensation paid to Dean Witter account executives is hereby granted.

For reasons set out hereinabove in this opinion, the Plaintiffs' Motion for Class Certification as to both proposed classes is hereby denied.

---

**13.** In the present action, for instance, the Plaintiffs have claims in addition to their claims pertaining to the non-disclosure of the account executive's compensation.

**14.** The Defendants also assert the right to arbitrate the non-federal claims. *See, e.g., Dean*

*Witter Reynolds, Inc. v. Byrd,* —— U.S. ——, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (although federal securities law prohibits compulsory arbitration of federal securities claims, non-federal claims may be arbitrated even if bifurcation of the proceeding is thereby necessitated).